R. W. BAXTER, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

1. **Railroads:** INJURY TO STOCK: NEGLIGENT DISPOSAL OF: PERSONAL INJURY: DAMAGES. The plaintiff in his petition alleged that the defendant had "killed and crippled" a steer, which it hauled from its track, and left on the highway, and that the plaintiff's horses became frightened thereat, whereby he was thrown from his buggy and injured. *Held,* that the *gravamen* of the action was not the killing and crippling of the steer, but the placing it on the highway, and that an instruction that the plaintiff, in order to recover, was required to prove that he had been "injured substantially as claimed by him," did not mean that he must prove that the defendant had killed and crippled the steer.

2. ———: ———: ———: EVIDENCE: SUBMISSION OF QUESTION TO JURY. Where, in such case, one witness testified that he heard the train pass through his field, heard the locomotive whistle when at the wagon road, and saw the cattle running away, and that upon going down to see if anything had got caught, he found the steer in question lying in the cattle guard, but that he was not dead; *held,* that this was sufficient evidence to warrant the court in submitting to the jury the question whether or not the defendant had killed or crippled the steer.

3. ———: ———: ———: ———. An instruction in such case submitted to the jury the question, whether or not the defendant's employees had placed the steer at or near the highway. *Held,* that such instruction was warranted by evidence that the steer was so crippled in the cattle guard that it was necessary to kill it, and that, after it had been removed therefrom under the direction of the section boss, he said to a son of the owner of the steer, "There is your steer; you can do what you please with him," and that it was thereupon drawn from the cattle guard and left on the highway.

4. ——: ——: ——: MASTER'S LIABILITY FOR SERVANT'S ACTS. The fact that the section boss and his men were not employed on the particular section where the steer was found held to be immaterial, since it was their duty to clear the track of obstructions at that point, if known to them; and such duty carried with it the obligation for its proper discharge to the public, at least so far as not to create a nuisance. The rule that a master is not liable for the torts of his servants beyond the scope of their employment held to have no application, since the case involved no willful tort, but only a negligent discharge of duty.

5. **Personal Injury**: DAMAGES: EVIDENCE. The plaintiff having testified that he had not been "laid up" a day, but that he had not been able to work as he had done before, *held*, that it was not improper to allow him to testify as to the value of his time per day, as that would enable the jury to measure the aggregate of his damages.

*Appeal from Mahaska District Court.*—Hon. A. R. Dewey, Judge.

Tuesday, January 31, 1893.

About the first of November, 1890, there was found in a cattle guard on the defendant's road a crippled steer, which was taken out and drawn to a place on the public highway near where the same is crossed by the defendant's road, and left there dead. As the plaintiff was passing along the public highway with his team and buggy, the team took fright at the steer, and ran up a bank, upsetting the buggy, throwing the plaintiff to the ground, and inflicting injuries, to his damage, for which this action is brought. There was a verdict and judgment for the plaintiff, from which the defendant appealed.—*Affirmed.*

*T. S. Wright* and *Seevers & Seevers*, for appellant.

*Bolton & McCoy*, for appellee.

Granger, J.—The presentation of the case in this court involves several complaints as to the action of the district court, each of which will be noticed.

I. The petition contains this averment: "That

the railroad company had killed and crippled a large,
white steer, which they had hauled out
from the track onto the edge of this
narrow passage leading to the track of the
railroad.'' The court, in stating the claim of the
plaintiff in its instructions, substantially repeated it.
In its third instruction the court said: ''Before the
plaintiff can recover in this case, he must have estab-
lished, by a preponderance of the evidence, the follow-
ing propositions: *First*, that he has been injured
substantially as claimed by him; *second*, that the same
was caused by the defendant placing, or causing to be
placed, upon the public highway, the body of the white
steer, as stated; *third*, that said injury was caused
by the team of the plaintiff becoming scared or fright-
ened at said steer; *fourth*, that said injury was wholly
without negligence, or want of proper care, on the part
of the plaintiff. If you fail to find affirmatively on
each and all of these propositions, then you should
return a verdict for the defendant.'' The following is
a part of the fifth instruction: ''If you find from the
evidence, as herein directed, that the defendant com-
pany had killed or crippled a steer, and that, through
their direction or the direction of their servants, agents,
or employees, had placed the carcass of the same upon
the public highway, substantially as charged,   *   *   *
then you should find for the plaintiff.'' It is said that,
conceding the third instruction to be correct, the fifth
can not be, because the averment of the petition is
that the defendant killed and crippled the steer, and
the third instruction directs that to recover the plain-
tiff must establish that ''he was injured substantially
as claimed.'' It is then said that the fifth instruction
''directs the jury that the plaintiff could recover if the
defendant either killed or crippled the steer.''

The criticism is without merit, because the instruc-
tion does not direct a recovery if the defendant either

*[Margin note: 1. RAILROADS: in-jury to stock: negligent dis-posal of: per-sonal injury: damages.]*

killed or crippled the steer, but it does if it killed or
crippled the steer, and placed the carcass upon the
highway, substantially as charged. The clause, "sub-
stantially as charged," has no reference to the state-
ment that the defendant killed or crippled the steer,
for the act of killing or crippling is no part of the
charge on which a recovery is sought. The charge
upon which the plaintiff seeks to recover is negligence,
and it is nowhere said in the petition that the killing or
crippling of the steer was negligently done. The
*gravamen*—the substantial cause—of the action is the
negligent act of the defendant charged by the plaintiff
as the cause of his injury. Keeping this in view, we
may be aided in the disposition of this, as well as of
other propositions presented. The charge in the peti-
tion is that "it was negligence on the part of the
defendant to haul said steer out on the public highway
at a point where it would not be seen by teams until
they were right upon it;   *   *   *   that said negligence
caused the plaintiff's injury," etc. The allegation as
to the steer being killed or crippled was only to show
a necessity for the company to act in its removal. Even
though alleged, it was not necessary for the plaintiff to
prove how the steer became injured in the cattle guard.
If he proved that the steer was there, and the defend-
ant negligently moved it onto the highway, so as to
cause the injury to him, he proved the cause of action
substantially as charged. It was immaterial whether
the defendant killed *and* crippled the steer, or killed *or*
crippled it. The third instruction does not make the
fact of the killing and crippling of the steer a condition
necessary to a right of recovery, as appellant seems to
believe. It first required proof that the plaintiff was
"injured substantially as claimed;" second, that such
injury was caused by placing the body of the steer on
the highway; and, third, that the team was frightened
by it. It does not contain even an indirect reference

to the killing or crippling of the steer. The harmony of the instructions would have been better preserved if the court had omitted from the fifth the requirement as to "killing or crippling," but there is no such defect as to justify a finding of prejudicial error.

II.   It is next said that the instructions are erroneous because there is no evidence tending to show that the defendant either killed or crippled the steer. A Mr. Bureman testified: "I heard the train pass through my field. I heard the locomotive whistle when they were at the wagon road, and saw the cattle running away. I went down to see if anything had got caught, and I found that steer lying right in the cattle guard, but he was not dead." It seems that the cattle were at the track when the train passed, and were frightened by it. When it had passed, the steer was in the cattle guard, and from other evidence it appears that its position was such that it had to be removed or pulled out of the way before the next train could pass. It could not have been there, then, before the train passed that Bureman saw. It must have gone into the cattle guard as the train passed. Such evidence affords a very reasonable supposition that the train caused the steer to go into the cattle guard, and hence caused its crippled condition, of which condition there can be no doubt. Such evidence might not be sufficient to show that the defendant wrongfully injured the steer, nor is such a proposition involved in the case.

2. —: —: —: evidence: submission of question to jury.

III.   It is also claimed that the instructions are erroneous because there is no evidence that the employees of the defendant company placed the steer in or near the highway where the plaintiff's horses became frightened. One Waller was the section foreman, and he and other section men were there when the steer was removed. The steer, when found, was on the track, and had to be

3. —: —: —: —.

removed for the passage of. trains. For one train to pass, Waller and the others pulled its head back from the track, and held it. It was then removed from the cattle guard. The distance from the cattle guard to the place where the steer lay was between twenty-two and twenty-three feet. There is a conflict in the evidence as to who caused the removal. William Wasson is a son of the owner of the steer, and he was present when the steer was removed. The steer was moved by hitching to it a team belonging to one Mitcham. There is evidence to show that the team was hitched to- the steer while it was on the cattle guard, and that it was drawn to the place near the highway, and that Mitcham drove the team, and he was not an employee of the company. The following is a part of William Wasson's testimony: "*Question.* You may state whether or not the section foreman requested you to get a rope. *Answer.* They said if they had a rope they would haul it off,—if I would get a rope,—and told me to get a rope, and I got it. *Q.* Did they use the rope you got in hauling the steer to where they left it? *A.* Yes, sir, they did." It does not appear that William Wasson had any authority whatever in regard to the steer, nor that he assumed any. Nor was there any person present authorized to do anything with the steer, except the employees of the company; and, conceding their duty to have been limited to keeping the track clear, it follows that, in removing the steer from the track, they must remove it to some place. After the team was hitched to the steer to remove it, it was killed by young Wasson,—as he claims, at the suggestion of the section boss; but we think that a matter of no importance. The steer was so crippled that it should have been killed. From the very nature of the situation, it could not be supposed that the carcass would be left as a stench beside the track. The situation required such a disposition as would avoid a public nuisance, and there

is testimony tending to show that it was the duty of the section men to bury the steer; and it was afterwards buried by section men, but not those present at the removal.

There is some contention as to the removal, and in this respect the appellant contends that the section men only removed the steer from the cattle guard, and that the further removal was by the son of the owner, or at least not by the employees of the company; and there is testimony to the effect that when the steer was off the cattle guard the section boss said to William Wasson: "There is your steer. You can do what you please with him." Neither Wasson nor any other person present was authorized to relieve the company of the responsibility for a proper removal of the steer. Conceding that it could have turned it over to the owner, and thus ended its responsibility for the proper care of it, it could not end its responsibility by turning it over to, or permitting those who were, in a legal sense, strangers, to take charge of it for removal to a proper place. If the section boss had, in terms, directed the steer to be left where it was left, it seems to us no reasonable doubt could be entertained of the liability of the company for resulting damage, because the entire act would have been involved in that of removing it from the track, and the law would not permit it to be done in such a manner as to constitute a public nuisance. No more will the law permit the company to escape responsibility by permitting others to do, in any improper manner, what it should have done in a proper manner. All that was done was under the eye of the employees of the company, upon whom devolved the duty of a proper removal and disposition, and all that was done was designed for that purpose. We may further say that, while the fact is much in doubt, there is testimony from which the jury could have found that the steer was placed in the highway by the direction of

the section boss; not, perhaps, in terms, but under-standingly.

IV. Because it is so allied to the foregoing proposition, and is involved to such an extent in its discussion, 4. ____: ____: ____: we here notice the claim of the appellant *master's liability for servant's acts.* that the section boss and men, in placing the steer on the highway, were not acting within the scope of their employment. In removing the steer from the track, they were unmistakably acting within such a scope. We have said, and we hold, that the authority to remove the steer from the track devolved upon the employees of the company the duty of making such a disposition of it as would not constitute a public nuisance. Such a rule is demanded by the plainest considerations of public policy.

It appears that Waller and his men were not employed on the particular section where the steer was found, and this point is urged as against their authority. It does, however, appear that it was their duty to clear the track of obstructions at that point, if known to them; and such a duty would carry with it the obligations for a proper discharge of it as to the public; at least, so far as not to create a nuisance. No limitation of employment would be available to the company, as against such a rule. We are referred to several authorities sustaining the rule that, beyond the [scope of their employment, a master is not liable for the torts of his servants, and the rule is not to be questioned. In this connection the appellant quotes from *Mali v. Lord,* 39 N. Y. 381, as follows: "It can not be presumed that a master, by intrusting his servant with his property, and conferring power upon him to transact his business, thereby authorizes him to do any act for its protection that he could not lawfully do himself, if present." Comment upon that case will serve to show a distinction of this case from those cited. Emphasis is placed in argument upon the thought that the master will not be

presumed to have authorized an act in the discharge of a duty by a servant "that he could not lawfully do himself, if present." The rule is there applied to this case by saying: "Nor could the defendant, if personally present, have lawfully placed the steer on or near the highway, and thereby created a nuisance." In the *Mali case* the cause of action was a willful trespass, in an unlawful search of a person by employees in the defendant's store, to discover property supposed to be concealed; and the language quoted has reference to such a state of facts. The case holds that such acts, not being shown to have been authorized by the master, will not be presumed to have been, merely by intrusting the servant with his property, where the act would be unlawful for the master himself. Or it is perhaps more accurate to say that such a statement appears by way of argument in the case. In the *Mali case* the cause of action was for willful misconduct in the search of a person by the employees of the defendant. This case does not involve a question of the willful or malicious conduct of the employees of the defendant company, but the negligent discharge of a duty to which they were assigned; and the question of what the defendant could have lawfully done, if present, in no way affects its liability. It authorized the removal of the steer. The act of removal necessarily involved a discretion, to some extent, or an exercise of judgment, as to the manner of removal, on the part of the employees, and the negligence complained of is as to the discharge of this duty. The authorities cited are without application. It may be further stated that the rule contended for is not in harmony with that announced in *McKinley v. C. & N. W. Railway Co.*, 44 Iowa, 314, which has since been followed in this state.

These considerations dispose of the complaints as to the fifth instruction given by the court, and the refusal to give the fourth and fifth instructions asked.

V. The petition shows, by way of damage, that from the time of the injury plaintiff "has been unable to work." On the trial, after other testimony by him as to his injuries, and the work he has done, the following appears: "*Question*. Have you been laid up, Mr. Baxter? *Answer*. Not a day. *Q*. All you claim is, you are not able to do as much work as you did before? *A*. No, I have not. I do what I can." The plaintiff was afterwards recalled, and was asked: "*Q*. What is your time worth a day?" This was objected to by the defendant because incompetent, immaterial, and irrelevant. The objection was overruled, and the defendant excepted, and the witness answered: "I think it would be worth one dollar per day." It is urged that, as the plaintiff had not lost a day, the evidence as to the value of his time per day furnished an improper basis to estimate the damage. Evidence in the case enabled the jury to estimate approximately the aggregate loss of time because of the injury. The value of his time per day would enable the jury to measure the aggregate of his damage. The ruling was not error.

5. Personal injury: damages: evidence.

From these conclusions the judgment should be AFFIRMED.